# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| PATRICK POOLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 10159 |
| v. | ) | |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) | Maria Valdez |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Patrick Poole's claims for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 19] is denied.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On May 1, 2010, Plaintiff filed a claim for Disability Insurance benefits. Previously, on August 20, 2009, he had filed a claim for supplemental security income. In both applications, Plaintiff alleged disability beginning July 30, 2009.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

The claims were denied initially and upon reconsideration, after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 12, 2011. Plaintiff, who personally appeared and testified at the hearing, was represented by counsel. Vocational expert James Breen also testified.

On October 4, 2011, the ALJ denied Plaintiff's claims, finding him not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND[2]

### A.    <u>Background</u>

Plaintiff was born on June 8, 1961 and was 50 years old at the time of the ALJ hearing. He had most recently worked part-time as a security guard, and before that as a municipal maintenance worker and janitor. In 1983 Plaintiff was kicked by a horse, fracturing his right wrist. (R. 259.) The break healed, but Plaintiff experienced pain in the wrist, the severity of which increased over time. *Id.* In 1994, Plaintiff underwent surgery on his wrist to remove three bones. (R. 259, 261.) Plaintiff continued to work, but ultimately stopped in 2009.

### B.    <u>Medical Evidence</u>

In November 2009, Plaintiff was referred for an examination with Dr. M.S. Patil to provide evidence in evaluating his application. (R. 259.). *Id.* At that appointment, Plaintiff reported that he was experiencing "mild intermittent pain"

---

[2]  The following facts from the parties' briefs are undisputed unless otherwise noted.

in his right wrist when lifting more than ten pounds, operating a door knob, turning on the faucet, or squeezing a rag or cloth. *Id.* He reported taking Tylenol as needed. *Id.* Dr. Patil reviewed an x-ray performed that same day, which he found to show "marked deformity about the right wrist" and the absence of the removed bones, "questionable fusion of the distal capitate with the third metacarpal," and "a few bony fragments" about the distal radius. (R. 262.) In his examination, Dr. Patil noted that Plaintiff had a range of motion in his right hand that was limited to about fifty percent of normal in all areas. (R. 261.) However, Dr. Patil also noted that Plaintiff had grip strength of four on a one-to-five scale, that Plaintiff had only mild difficulty with operating a door knob or squeezing, and that he showed mild weakness in his right hand but otherwise had no difficulty with manipulative movements. *Id.*

In December 2009, Dr. Marion Panepinto performed an analysis of Plaintiff's medical records. Dr. Panepinto noted that Plaintiff's x-ray reflected the removal of three bones from Plaintiff's right wrist. (R. 266.) Dr. Panepinto also discussed Dr. Patil's findings, including those relating to Plaintiff's strength, limitation of motion, and mild weakness in his wrist. *Id.* Dr. Panepinto concluded that Plaintiff's impairments were nonsevere. *Id.* This determination was reviewed and affirmed by Dr. Virgilio Pilapil in August of 2010. Dr. Pilapil noted that Plaintiff stated his pain had increased since the prior review by Dr. Panepinto. (R. 276.) However, Dr. Pilapil concluded that "no significant medical changes" were evident on reconsideration, and affirmed Dr. Panepinto's previous finding. *Id.*

On August 31, 2010, another x-ray of Plaintiff's right wrist was performed. (R. 335.) Dr. Krishna Parameswar, interpreting the results, concluded that the x-rays "of the right hand [were] normal with no evidence of bony or joint abnormality." *Id.* (R. 337.) Dr. Parameswar also noted that there was "no evidence of acute fracture or dislocation," and that there was "[s]light narrowing of the intercarpal joint" which was viewed to be "consistent with arthritic process." *Id.* Dr. Parameswar's overall impression was of "[v]ery mild arthritic change." *Id.*

In August 2010, Donald Henderson, Ph.D performed a review of Plaintiff's medical records from a psychiatric perspective. (R. 277-89.) While Henderson noted that Plaintiff had not alleged any mental limitations in his initial application, Plaintiff had subsequently indicated that he had become increasingly depressed. (R. 289.) However, Henderson noted that no treating provider had diagnosed Plaintiff with a mental health-related impairment and that Plaintiff's previous mental health examinations had shown normal results. *Id.* Accordingly, Henderson concluded that Plaintiff did not have a severe mental impairment. (R. 277.)

In April of 2011, Plaintiff began psychiatric treatment. (R. 305-08.) In his initial evaluation, his mood was recorded as "[s]ad, depressed," and he "[e]ndorsed depressive symptoms of anhedonia; feelings of hopeless, [feeling] helpless 'sometimes' and worthless; decreased energy; decreased concentration; alternately psychomotor agitation and retardation; social withdrawal; and crying spells." (R. 307.) His affect was recorded was "[s]ad and frustrated," but his thought content was "appropriate," his insight "fair," and his judgment "[f]air to good with impulse

control." *Id.* He was diagnosed with recurrent, moderate Major Depressive Disorder. *Id.* The record reflects that Plaintiff was seen for follow-up appointments throughout 2011. In May, he "expressed frustrations and sadness over having no current income and subsequent lifestyle restrictions." (R. 316.) He also reported "fair to good sleep," and "indicated that he socializes with neighbors frequently to talk or to watch a ball game." *Id.* In June, Plaintiff reported that he had become "more depressed" because of the difficulty in accomplishing certain tasks due to increased pain. (R. 311.) However, he also reported "fair sleep," a normal appetite with no weight change, and that he "continue[d] to socialize with family and neighbors." (R. 311-12.) While the notes reflected that Plaintiff "continued to be depressed over injury, pain, and loss of financial resources with subsequent lifestyle changes," they also showed that he demonstrated good comprehension, fair insight, and sound judgment. (R. 312-13.)

### C.     <u>Plaintiff's Testimony</u>

Plaintiff testified that he experienced constant pain in his wrist. (R. 41.) The pain had been an issue for 15 years or so, but had increased over time. (R. 46-47.) On a typical day, the pain was a seven or eight on a one-to-ten scale (R. 42.) He had been prescribed Naproxen and Tramadol, which helped to ease the pain, although the medications made him drowsy. (R. 42-43.) Plaintiff stated that he did not drive because of the resulting pain in his wrist, but he also testified that his driver's license had been suspended. (R. 40.) His medical providers had suggested a wrist

fusion surgery, but he was afraid to undergo that procedure, even if it would help with the pain. (R. 44.)

With regard to his functional capacity, Plaintiff testified that twisting his wrist in particular was painful, and made it difficult for him to open doors or to perform other similar movements. (R. 47.) He was unable to tie his shoes. (R. 47-48.) He was also unable to shave himself, and instead he would have a friend shave him. (R. 48.) The pain was also worsened by cold weather. (R. 48.) Plaintiff was able to lift "maybe a couple of pounds" with his right hand, and 20 to 25 pounds with his left. (R. 44.) He stated that he could stand only for 10 to 15 minutes, because he had "bad knees." (R. 44-45.) He also stated that he could sit for 15 to 20 minutes but would then need to get up to stretch. (R. 45.) He had received one steroid injection which had "helped a little," and he also wore a splint on his wrist at all times. (R. 49.) Plaintiff also stated that he was unable sleep at all at night, although he did not know the reason for his inability to do so. (R. 50.)

Plaintiff testified that he was seeing a psychologist because he was "always depressed," and had felt worthless for a long time. (R. 50.) When asked by the ALJ why, despite his feelings, he had only recently begun to seek psychiatric treatment, Plaintiff stated that "until I was talking to the doctor and she advised me to . . . I just never gave it any thought . . . ." (R. 51.) The ALJ pointed out that—although he had testified that he was unable to drive—in his self-completed report regarding activities of daily living, Plaintiff had stated that he drove every day. (R. 51-52.)

Plaintiff stated that, because the report had been completed earlier—in July of 2010—that was true at the time, but it was no longer true. (R. 52.)

### D. **Vocational Expert Testimony**

The ALJ asked Vocational Expert ("VE") James Breen whether a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") limiting him to light work, and who could use the right hand frequently and the left hand unlimitedly, could perform any of Plaintiff's past work. (R. 53.) The VE said that the person could perform the job of security guard. The VE also stated that the hypothetical person could perform the other jobs of fast food worker, mail clerk, and cashier. (R. 53.) The ALJ then further limited the hypothetical individual to only occasional use of the right hand, which did not alter the VE's answers. (R. 53-54.) Plaintiff's counsel then asked the VE if any of the jobs would tolerate a hypothetical individual who would "doze off on the job." (R. 55.) The VE stated that dozing would preclude employment. (R. 55.) In response to the attorney's questioning, the VE also stated that—were the hypothetical individual to require sedentary work—there would be no available jobs because such employment would require frequent use of both arms. (R. 55-56.)

### E. **ALJ Decision**

The ALJ analyzed Plaintiff's claim under the five-step process applicable to Social Security claims. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 30, 2009. (R. 21.) At step two, the ALJ concluded that Plaintiff had the

severe impairments of a "history of right wrist bone removal status post right wrist surgery." (R. 21.) Although he analyzed the effects of Plaintiff's major depressive disorder, the ALJ determined that this impairment considered by itself was not severe. (R. 22-23.) The ALJ concluded at step three that Plaintiff's impairments, considered alone or in combination, did not meet or medically equal a Listing. (R. 24.) The ALJ then determined that Plaintiff retained the RFC to perform light work involving frequent use of the right hand and no limitation on use of the left hand. (R. 24.) He noted that Plaintiff had complained of increasing pain since his original wrist injury. (R. 25.) However, while the record demonstrated such complaints over time, the ALJ found that Plaintiff's corresponding treatment was conservative and the accompanying medical testing was unremarkable. (R. 26-27.) The ALJ also discussed the medical evaluations of record, which had both concluded that Plaintiff's impairments were nonsevere. (R. 27.) Although he found the opinions "to be mostly informed and consistent with the objective medical record," based on the record as a whole, the ALJ nonetheless found Plaintiff's RFC to be more limited than the limitations suggested by the medical experts. *Id.*

Based on this RFC, the ALJ concluded at step four that Claimant could perform his past relevant work as a security guard. (R. 28.) Alternatively, at step five, the ALJ concluded that that Plaintiff could perform other jobs existing in significant numbers in the national economy, leading to a finding that Plaintiff was not disabled under the Social Security Act. (R. 28-29).

## DISCUSSION

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a claimant is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520(a)(4). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps 1 through 4. *Id.* Once the claimant shows an inability to perform past work, however, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is

limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). And, in rendering a conclusion, an ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005)) (internal quotation marks omitted).

## III.    ANALYSIS

Plaintiff argues that the ALJ erred by finding that his mental impairment was not severe, by failing to account for the results of a 2009 x-ray in determining the severity of his impairments, and by finding his RFC to be more limited than suggested by the medical experts of record. However, because the ALJ did not err in any of these respects, and because his determination was supported by substantial evidence, the decision is affirmed.

## A.    Assessment of Plaintiff's Mental Impairment

Plaintiff first argues that the ALJ erred when he determined that plaintiff's depression was not a severe impairment. At step two of the five-step analysis, the ALJ found that—while Plaintiff's previous wrist injury resulted in a severe impairment—plaintiff's mental impairment, considered by itself, was not severe. (R. 21-22.) A severe impairment is one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also id.* § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). Citing treatment notes and test results, Plaintiff argues that "the medical evidence and testimony of record" showed "that Mr. Poole's mental impairments limit his energy, his ability to concentrate, and his ability to engage socially," and therefore that the ALJ erred in finding those impairments were not severe. (Pl.'s Mem. at 8.) Plaintiff's argument, however, is unavailing.

First, the evidence that Plaintiff identifies does not in fact show what he contends it does. With respect to the treatment records, although Plaintiff alleges that they demonstrate that his "mental impairments limit his energy, his ability to concentrate and his ability to engage socially," (Pl.'s Mem. at 8), this is simply not the case. The notes do show that, at a number of treatment sessions, Plaintiff's treating psychologist record Plaintiff's mood as sad or depressed, (R. 307, 312, 316, 320), and that Plaintiff reported feelings of depression related to his inability to work and accompanying loss of income. (R. 305, 311, 316, 319.) However, while his

initial assessment noted "decreased concentration" and "social withdrawal" in the mental status examination, (R. 307), subsequent notes recorded that "[h]e continues to socialize with friends and neighbors" on a basis described as "frequently." (R. 312, 316.) Furthermore, nowhere aside from the initial assessment do the notes reflect (or is Plaintiff recorded as reporting to his therapist) difficulties with concentration. On the contrary, as the ALJ noted, (R. 22-23), Plaintiff's thought processes were consistently reported as "[l]ogical and relevant" or "coherent and relevant," and he was recorded as having good to fair insight and sound judgment. (R. 307, 313, 316. 320). The treatment notes cited by Plaintiff simply do not show the evidence he argues required the ALJ to reach a different conclusion.

Similarly, the other piece of evidence Plaintiff cites in support of his assertion—his scores on the Global Assessment of Functioning (GAF)—also do not show that his impairment was necessarily severe. The GAF is a 1-to-100 scale "used by mental health clinicians and physicians to help determine how well a person is doing in adjusting to the psychological and other challenges of living; the higher the score, the better he's doing."[3] *Price v. Colvin*, 794 F.3d 836, 839 (7th Cir. 2015). As the ALJ noted, (R. 22), it is true that at his initial mental health assessment Plaintiff scored 50 on the GAF, which corresponds to "serious symptoms" or

---

[3] Although still in use at the time of Plaintiff's evaluation, the American Psychiatric Association has since abandoned the GAF metric "because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.' " *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed.2013)).

impairments.[4] However, as the ALJ also noted, a short time later (and after minimal treatment and no medication), claimant recorded a GAF score of 60, indicating only moderate symptoms or difficulties.[5] And a GAF score by itself is not a determinative assessment of the extent of a claimant's mental impairment. The GAF measures both the severity of a subject's symptoms and his functional level, and "[b]ecause the 'final GAF rating always reflects the worse of the two,' the score does not reflect the clinician's opinion of functional capacity. Accordingly, 'nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.' " *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir.2003)). Even when considered with the treatment notes otherwise cited by Plaintiff, he simply has not shown that the ALJ was required to find Plaintiff's mental impairment to be "severe" based on the record before him (a proposition for which he does not advance any legal authority).

Furthermore, the ALJ's decision at step 2 was supported by substantial evidence, and this Court "will not . . . reweigh the evidence or substitute [its]

---

[4] "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' " *Jelinek* v. Astrue, 662 F.3d 805, 807 n.1 (7th Cir. 2011) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000)).

[5] "[A] GAF between 51 and 60 reflects 'Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).' " *Jelinek*, 662 F.3d at 807 n.1 (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL at 32).

judgment for that of the ALJ's." *See Pepper*, 712 F.3d at 361-62.[6] The ALJ found

generally that, while Plaintiff's treatment records reflected his feelings of sadness

and hopelessness, they also demonstrated logical and relevant thought processes, a

lack of delusions or hallucinations, fair to good judgment and impulse control, and

fair insight. (R. 22.) Furthermore, Plaintiff had not been prescribed medication in

relation to his mental impairment, his treatment otherwise consisted simply of

outpatient psychotherapy, and his condition had improved during the brief period of

his treatment. (R. 22.) These findings were supported by Plaintiff's treatment notes,

(R. 305-08, 311-13, 315-17, 319-21), which are in fact some of the same records

Plaintiff cites in support of his argument. (Pl.'s Mem. at 8.) The ALJ also

appropriately applied the "special technique" applicable to the evaluation of mental

impairments. *See* 20 C.F.R. § 404.1520a. He determined that, with respect to

Plaintiff's activities of daily living, Plaintiff demonstrated no limitations based on

his self-reported ability to prepare his own meals, shop, read, watch television, and

perform other activities, as well as a lack of evidence indicating otherwise in his

treatment records. (R. 22-23.) With respect to social functioning, the ALJ also found

no limitation because Plaintiff had reported socializing frequently with his

neighbors, and again the records did not reflect any other limitations in this area.

(R. 23.) And although Plaintiff had reported depressive symptoms, the ALJ found

that he had only mild limitations with regard to concentration, persistence, or pace

[6] While Plaintiff characterizes the ALJ's alleged error in this respect as a legal error, his actual argument on this point is that the ALJ's severity conclusion was "not supported by the medical evidence and testimony of record," which is a factual determination. *See Stenn v. Astrue*, No. 12 C 3990, 2013 WL 4011014, at *6-8 (N.D. Ill. Aug. 6, 2013) (discussing the distinction in social security cases).

because his mental status examinations had been consistently normal and his treatment records reflected intact remote and immediate memory, good thinking and judgment, and no disordered thought processes. (R. 23.) Furthermore, Plaintiff had no episodes of decompensation. (R. 23.) All of these conclusions are supported by the record. (R. 305-08, 311-13, 315-17, 319-21.) The ALJ's finding at step 2 was therefore supported by substantial evidence. *See Pepper*, 712 F.3d at 366 (7th Cir. 2013) (affirming mental impairment as not severe where ALJ relied on claimant's response to medication and treatment notes which revealed "no abnormalities in [his] insight or judgment, orientation, memory or impairment, and mood").

Finally, even if the ALJ had erred in determining that Plaintiff's mental impairment was not severe at step 2, any such error would be harmless. While an ALJ must make a determination at step 2 as to whether the claimant's impairment or combination of impairments in severe, "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. Therefore, the step two determination of severity is 'merely a threshold requirement.' " *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)); *see also* SSR 96-3p, 1996 WL 374181, at *2. Because the severity determination simply controls whether Plaintiff's application as a whole will proceed, any mistake in mischaracterizing an impairment as nonsevere at step two "is of no consequence with respect to the outcome of the case" where the ALJ properly considers that that impairment, together with a claimant's other

impairments, in the rest of the analysis. *See id.*; *see also Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment. Here, the ALJ categorized two impairments as severe, and so any error of omission [of a third] was harmless.").

That is what happened in this case. Despite finding that Plaintiff's depression was not in itself a severe impairment, the ALJ nonetheless considered its effects in determining Plaintiff's RFC, (R. 22-23, 27-28), as he was required to do. *See* 20 C.F.R. § 404.1520a(d)(3). In addition to considering the treatment records as discussed above, the ALJ also noted that Plaintiff's depression had been characterized by one provider as "slight." (R. 27.) Furthermore, the ALJ noted that—although claimant reported "always" being depressed—he waited until after his claim had been filed prior to seeking treatment, and his explanation for the delay was that treatment simply never "crossed his mind." (R. 27.) These facts were properly considered in formulating Plaintiff's RFC, *see* 20 C.F.R. § 404.1545, which Plaintiff does not separately challenge.[7] The ALJ's RFC determination was supported by substantial evidence, and any error at step two therefore was

---

[7] Plaintiff does not put forward any argument related to the ALJ's RFC determination, instead framing his argument around the ALJ's determination of severity. (Pl.'s Mem. at 7-8.) Furthermore, all of the authorities he cites address solely the determination of severity at step two. S*ee* SSR 96-3p, 1996 WL 374181, at *1; *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990); *Salazar v. Barnhart*, No. 03 C 3099, 2004 WL 2966919, at *5 (N.D. Ill. Nov. 24, 2004). And aside from the treatment notes discussed above, Plaintiff cites no evidence in the case to support his position, nor does he address the ALJ's discussion of his mental impairments in formulating his RFC.

harmless. *See Curvin v. Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015) ("[E]ven if there were such an error at step 2, it would have been harmless because the ALJ properly considered all of [claimant's] severe and nonsevere impairments, the objective medical evidence, her symptoms, and her credibility when determining her RFC immediately after step 3."); *see also Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (affirming ALJ's determination where "[claimant's physician] was of the opinion that [claimant's] mental condition was treatable and under control, and controllable conditions do 'not entitle one to benefits or boost one's entitlement by aggravating another medical condition.' ") (quoting *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir.2004)).

## B.    Evaluation of Plaintiff's 2009 X-Ray

Plaintiff next argues that the ALJ erred by overlooking medical evidence favorable to his claim. In his decision, the ALJ referenced the 2010 x-ray and stated that "x-rays of the right hand resulted in normal findings with no evidence of bony or joint abnormalities." (R.24), Plaintiff claims that, in doing so, the ALJ ignored an earlier x-ray which had shown otherwise. (Pl.'s Mem. at 9.) In determining disability, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton*, 596 F.3d at 425. However, "an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion." *Id.*

In 2009, Plaintiff underwent the first x-ray of record. In interpreting that test, Dr. Howard Rose noted "marked deformity about the right wrist," the absence of the navicular, lunate, and triquetrum bones, that "the capitate articulates with the distal radius," and that there was "questionable fusion of the distal capitate with the third metacarpal." (R. 263.) Dr. Rose also noted that there was "marked irregularity about the distal radius with a few bony fragments noted." *Id.* Plaintiff is correct that, in his opinion, the ALJ did not specifically address Dr. Rose's interpretation of the 2009 x-ray. Instead, he referred to a 2010 x-ray, (R. 24, 26), from which Dr. Krishna Parameswar observed "no evidence of acute fracture or dislocation" and "[s]light narrowing of the intercarpal joint" which the doctor viewed as "consistent with arthritic process." (R. 337.) Otherwise, however, Dr. Parameswar noted "very mild arthritic change." *Id.* The ALJ summarized this evidence by stating that "x-rays of the right hand resulted in normal findings with no evidence of bony or joint abnormalities." (R. 26.)

Despite the fact that he did not address the earlier x-ray itself, however, the ALJ did explicitly discuss and rely on the consultative examination of Dr. M.S. Patil, (R. 26), as Plaintiff acknowledges. (Pl.'s Mem. at 10.) In his examination, Dr. Patil explicitly addressed the 2009 x-ray, which he noted "revealed marked deformity about the right wrist," that certain bones of the wrist were not present, and that Plaintiff demonstrated "marked irregularity about the distal radius." (R. 262.) Dr. Patil also noted that Plaintiff's range of motion in his right wrist was limited by about 50 percent in all areas. (R. 261.) However, Dr. Patil provided an

analysis of Plaintiff's movement in his right hand, and found only mild difficulty using door knobs and squeezing and no difficulty in the other functional areas. (R. 261.) Dr. Patil also determined that Plaintiff exhibited only a mild degree of weakness, that his overall grip strength was rated as a four out of five, and that there was no demonstrated deformity of any joint. *Id.*

Although an ALJ may not ignore an entire line of evidence in reaching his opinion, he also "need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion." *Denton*, 596 F.3d at 425. By relying on Dr. Patil's evaluation—which in turn incorporated the results from the 2009 x-ray into its findings—the ALJ built such a "logical bridge" to his conclusion as to Plaintiff's limitations. *See Michalec v. Colvin*, – Fed. App'x –, No. 15-1825, 2015 WL 8526359, at *3 (7th Cir. Dec. 10, 2015) (holding no error where "[claimant] says the ALJ should have considered a 2009 MRI . . . . In formulating [claimant]'s residual functional capacity, however, the ALJ relied on Dr. Smith's report, which relied on the MRI and x-ray results"); *see also Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) (holding no error where "the ALJ focused solely on a 2003 MRI and did not discuss a 2006 MRI" because the "failure to discuss the 2006 MRI matter[ed] little in light of [claimant's] treating physicians' consistent description of her condition as mild or benign"). The ALJ did not selectively consider the evidence in failing to explicitly acknowledge the earlier MRI in his findings, and accordingly there was no error on this account.

## C. Formulation of the RFC

Finally, Plaintiff argues that the ALJ erred by "improperly substitut[ing] his own opinion for that of a medical expert." (Pl.'s Mem. at 10.) He contends that—because the ALJ found Plaintiff to have a residual functional capacity which was more limited than that assigned by any physician—the ALJ "substituted his own lay judgment for that of a medical expert." *Id.* While Plaintiff provided some records of sporadic treatment related to his hand, the only medical opinions of record relating to his residual functional capacity came from state agency physicians. As noted above, Dr. Patil concluded that—although Plaintiff's range of motion in the wrist was reduced—he had good grip strength, demonstrated only mild difficulty with operating a door knob and squeezing but otherwise showed no difficulty with manipulative movements, and demonstrated only mild weakness in his right hand. (R. 261.) After a review of the medical evidence in the case, Dr. Panepinto concluded that Plaintiff's impairments were nonsevere, and accordingly did not perform a residual functional capacity analysis, (R. 266), a decision which was affirmed by Dr. Pilapil. (R. 276.) In his decision, however, the ALJ determined that Plaintiff's history of wrist injury *was* a severe impairment. (R. 21.) However, despite his combination of impairments, he nonetheless found that Plaintiff was able to perform light work with the frequent use of his right hand. (R. 24.)

Plaintiff argues that, because the ALJ found his impairments to be more limiting than the medical opinions of record had indicated, "an evidentiary deficit was created which the ALJ then improperly filled with his own lay opinion." (Pl.'s

Mem. at 11.) In effect, Plaintiff argues that an ALJ may not find a claimant to have an RFC which is more restricted than that ascribed to the claimant by a medical expert. But this is incorrect. Rather than a strictly medical decision, the determination of a claimant's RFC "is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). Accordingly, as the Seventh Circuit has specified, in formulating an RFC "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Within this framework, an ALJ does not err when he finds a claimant to have an RFC which is more limited than that ascribed by the medical experts. *See Castile*, 617 F.3d at 929. In this case, it is apparent that—despite the conclusions of the medical experts finding Plaintiff capable of more strenuous work—the ALJ found Plaintiff's statements as to the effects of his symptoms to be partially credible, and on that basis found that Plaintiff's impairments limited his RFC to an extent greater than that specified by the medical experts but lesser than that claimed by Plaintiff himself. (R. 27.) This is a determination that the ALJ was permitted to make. *See id.* ("It was because of and not in spite of [claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record.").

Plaintiff cites a number of cases in support of his argument, but they do not demand reversal of the ALJ's decision. In each case by Plaintiff, the ALJ erred by assigning the claimant an RFC which ascribed greater abilities than those which

were supported by the medical evidence of record. In *Suide v. Astrue*, the claimant's treating physician had concluded that the claimant could never lift or carry more than ten pounds and had a combination of other limitations which precluded her from even sedentary work. *See* 371 F. App'x 684, 687 (7th Cir. 2010). The ALJ, however, discounted this opinion and instead concluded that the claimant could lift twenty pounds occasionally and could perform light work. *Id.* at 688. But aside from discounting the treating physician's opinion, the ALJ did not indicate the weight given to any of the other evidence regarding the claimant's functional capacities. *Id.* at 690. Furthermore, the claimant had suffered a stroke between her evaluation by the medical experts and the ALJ's decision, and no medical expert had considered the effect of the stroke on her functional capacity. *Id.* In that situation, the Seventh Circuit found that there was an "evidentiary deficit" and remanded the case because it was unclear "how the ALJ concluded that [the claimant] could stand or walk for six hours a day." *Id.* Similarly, in *Scott v. Astrue*, the Seventh Circuit faulted the ALJ because the ALJ "asked the VE to consider what jobs would be available to [the claimant] if she can stand for 6 hours in a regular day and lift 10 to 20 pounds, but the ALJ did not identify any medical evidence to substantiate her belief that [the claimant] is capable of meeting those physical requirements." 647 F.3d 734, 740 (7th Cir. 2011). And in *Barrett v. Barnhart*, the Seventh Circuit found an ALJ's RFC determination unsupported where the ALJ found that the claimant could stand for two hours at a time, but the only physician providing an opinion as to claimant's abilities "had not known about the problem with her knees" when he rendered that

opinion. 355 F.3d at 1066-67. In each case cited by Plaintiff, the medical evidence supporting the ALJ's RFC determination either did not exist or was not made clear.

Here, in contrast, the medical opinions of record supported the ALJ's determination because those opinions found Plaintiff to have a *greater* capacity than that ultimately ascribed by the ALJ. Based on the record, both Drs. Panepinto and Pilapil concluded that Plaintiff's impairments were not severe and therefore did not restrict Plaintiff's functional capacity. Rather than simply crediting these physicians' opinions, however, the ALJ partially credited Plaintiff's statements that his symptoms limited his residual functional capacity to an extent greater than that suggested by the medical experts' opinions. In contrast to the cases above, then, the ALJ's conclusion in this case that Plaintiff was capable of performing light work was supported by the opinions of the medical experts, who had concluded that— rather than simply limited light work—plaintiff could perform *all* work. Accordingly, there was no "evidentiary deficit," and the ALJ did not err in his RFC determination. *See Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1085 (N.D. Ill. 2011) ("In *Suide,* the ALJ rejected a treating doctor's opinion and then made an RFC determination without considering any other medical evidence. By contrast, in the case at bar, there is medical support for Claimant succeeding at a sedentary job. The ALJ here accepted alternate medical evidence and incorporated several additional limitations to give Claimant's subjective assessments the benefit of the doubt, ultimately arriving at an RFC that is supported by substantial evidence.") (citations omitted); *see also Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *8

(N.D. Ill. Oct. 29, 2014); *Cabrera v. Astrue*, No. 10 C 4715, 2011 WL 1526734, at *12 (N.D. Ill. Apr. 20, 2011) ("Plaintiff is correct that [the RFC] is more restrictive than the state agency consultants' findings of no manipulative limitations whatsoever, but the ALJ fairly credited Plaintiff's testimony in that regard and modified the RFC assessment accordingly.").

Although not advancing significant argument on this point, Plaintiff also implies that the ALJ was required to call another medical expert in order to impose limitations on his RFC in excess of those ascribed by the medical experts of record. In certain circumstances, an ALJ may be required to consult a medical expert where, " 'in the opinion of the administrative law judge,' new evidence might cause the initial opinion to change." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) (quoting SSR 96–6p, 1996 WL 374180, at *4). However, in this case the Commissioner had already undertaken a consultative examination of Plaintiff's hand in order to provide sufficient evidence for the record, *see* 20 C.F.R. § 1519a, and it was on the basis of this augmented record that the state agency consultants rendered their opinions. Furthermore, no additional medical evidence regarding Plaintiff's wrist was introduced between the rendering of those opinions and the ALJ's evaluation which would have affected the doctors' conclusions and made an additional consultation necessary. *Cf. Wilcox v. Astrue*, 492 F. App'x 674, 678 (7th Cir. 2012) (suggesting ALJ's soliciting additional medical evidence may be appropriate where "specialized medical evidence is required but is missing from the record, or if there is a change in condition but the current severity of the

impairment is not established"). And while the ALJ does have some independent duty to develop the record as discussed above, it is nonetheless Plaintiff "who bears the burden of proving that [he] is disabled." *Castile*, 617 F.3d at 927 (7th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(A) and 20 C.F.R. § 404.1512(a)). In this case, the ALJ had sufficient evidence regarding plaintiff's wrist condition, and he did not err in failing to seek an additional medical evaluation before rendering his conclusions. *See Skinner*, 478 F.3d at 844 (holding no need for additional medical opinion where "[t]he ALJ was highlighting the lack of objective medical data to support [claimant]'s claimed disability and the predominance in the record of [claimant]'s own subjective complaints; he was not commenting on a gap in the medical evidence that a consultative examination would have filled").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 12] is denied. Judgment will be entered in favor of the Commissioner.


SO ORDERED.                                    ENTERED:



DATE:      **March 28, 2016**            _____
                                         **HON. MARIA VALDEZ**
                                         **United States Magistrate Judge**